1  **WO**

2

3

4

5

6

7                 IN THE UNITED STATES DISTRICT COURT

8                   FOR THE DISTRICT OF ARIZONA

9

10

11

12  Darrell Proctor,              )   No. 06-CV-1357-PHX-RCB
                                  )
13          Plaintiff,            )        **O R D E R**
                                  )
14  vs.                           )
                                  )
15                                )
    Safeway Food & Drug, Inc.,    )
16                                )
            Defendant.            )
17                                )
                                  )
18

19      Currently pending before the court is a motion for summary

20  judgment brought pursuant to Fed. R. Civ. P. 56 by the defendant

21  Safeway, Inc.[1] (doc. 15).  For the reasons set forth below, the

22  court grants defendant's motion for summary judgment.

23                        ***Background***

24      On approximately November 11, 2002, plaintiff was hired as a

25  part-time Food Clerk.  Def. SOF (doc. 16) at ¶ 1 (citations

26  omitted).  Plaintiff retained that part-time status throughout

27  _____

28      [1]    Safeway was improperly named as "Safeway Food & Drug, Inc." in the
    summons and complaint.

1   his tenure with Safeway in that he never worked the number of

2   hours which the governing collective bargaining agreements

3   required to attain full-time status.  Id., exh. I thereto (Decl'n

4   of Denise Diamond (Jan. 26, 2007)) at 2, ¶¶ 4-8.

5        In any event, part of plaintiff's training and orientation

6   included, in his words, a "large section on the sexual-harassment

7   [sic] issue."  Id. at 1, ¶ 2 (citing exh. A (Pl. Dep.) thereto at

8   38).  In addition, during his orientation plaintiff received a

9   copy of Safeway's "Employee Handbook/Store Policies" ("the

10  Handbook" or "the Employee Handbook") which contained its sexual

11  harassment policy.  Id. at 2, ¶ 5 (citing exh. A thereto at 40;

12  and exh. C thereto).  As succinctly summarized in the

13  "Policy/Rules/Employee Handbook Signoff Sheet," which plaintiff

14  signed, that policy is: "Sexual harassment is wrong and will not

15  be tolerated in any form at Safeway."  Id., exh. C thereto.

16       In its Employee Handbook, Safeway outlined its "Policy on

17  Harassment[,]" and provided representative definitions of what

18  "may" constitute "[u]nlawful sexual harassment[.]" Doc. 16, exh.

19  D thereto at 18.  The Handbook further set forth the procedures

20  an employee should follow if he or she "experienced . . .

21  harassment[,]" which included "immediate[]" reporting to any one

22  of several listed "Safeway representatives[.]" Id. at 19.

23  Another section of that Handbook set forth "what Safeway w[ould]

24  do with [a] report" of sexual harassment.  Id.  The procedure

25  began with "Safeway . . . promptly conduct[ing] a complete

26  investigation of [the employee's] report."  Id. Safeway's

27  Handbook is explicit: It "will not tolerate any acts of

28                              - 2 -

retaliation against [an employee] for making a report of harassment." Id. In fact, the Handbook goes on to state that if an employee "feel[s] that someone is retaliating against [them] for making a report," the employee is instructed to inform one of the listed Safeway representatives "so that Safeway can investigate [the employee's] concern and take appropriate corrective action." Id.

Plaintiff testified during his deposition that a statement of Safeway's "Policy on Harassment" was posted in the break room. Id., exh. A thereto at 53. That Policy was more detailed than the one in the Handbook in that it actually listed six "Human Resource Advisor[s]" by name and provided their telephone numbers. Id., exh. F thereto. The posted Policy also identified the "SVP, Corporate Human Resources" person by name and provided his telephone number. Id.

According to plaintiff, he was sexually harassed on two separate occasions by co-worker Roger Finn, a Courtesy Clerk. Plaintiff testified during his deposition that he "understood and knew of [Mr. Finn's] mental handicaps." Id., exh. A thereto at 54. More specifically, plaintiff testified that it was his "underst[anding]" that Mr. Finn was "mentally retarded." Id. Despite that, up until the time of the first incident plaintiff and Mr. Finn had an amicable working relationship.

Prior to the first incident plaintiff testified that he "had no problems with" Mr. Finn. Id. at 54 and 55. In fact, plaintiff thought that Mr. Finn "seemed like a nice enough guy." Id. at 54. He further described Mr. Finn as "friendly, [but] a

little withdrawn." <u>Id.</u>   "The entire time up until" the first
incident plaintiff "talked to" Mr. Finn, and "[j]oked around with
him." <u>Id.</u> at 89.   The two of them would watch television
together in the break room; and "[c]hat about whatever." <u>Id.</u>
When recounting his relationship with Mr. Finn, plaintiff
repeated that he "never had a problem or incident with" Mr. Finn
before the incidents of which he is complaining in this lawsuit.
<u>Id.</u>

    The first incident occurred on February 3, 2005, when
plaintiff had just finished his shift. <u>Id.</u> at 55.   Mr. Finn was
in the break room as plaintiff was "punching out." <u>Id.</u>   They had
been joking around, and as plaintiff left to go to the parking
lot, Mr. Finn followed him, continuing to talk as they walked.
<u>Id.</u> at 56; <u>see</u> <u>also</u> <u>id.</u>, exh. G thereto (Pl. "Statement of
Incident").   Plaintiff assumed that Mr. Finn was going to the
parking lot to "collect the carts." <u>Id.</u> at 56.   When plaintiff
got to his car, he "opened the door and got in." <u>Id.</u>, exh. G
thereto; <u>see</u> <u>also</u> <u>id.</u> exh. A thereto at 56.   As plaintiff
indicated in his "Statement of Incident[,]" written five days
after the event, Mr. Finn then "leaned into [plaintiff's] car and
asked[,] 'what was wrong with [plaintiff's] steering wheel'[.]"
<u>Id.</u>   Evidently this remark was precipitated by the fact that
plaintiff's steering wheel "is brittle and flaking off from heat
& wear." <u>Id.</u>

    In his Statement, plaintiff further wrote that "[Mr. Finn]
took his finger and touched the worn area on [the] wheel[,] then
removed his finger and, pretending to wipe it off[,] put his

- 4 -

finger on [plaintiff's] left inner thigh and slid it up." Id.
When specifically asked "how far up [his] thigh" Mr. Finn touched
him, plaintiff answered: "Not very.  If he got a quarter-inch it
is a miracle because my hand was right there." Id., exh. A
thereto at 57.  As to the length of time Mr. Finn's finger was on
plaintiff's thigh, plaintiff readily admitted that it was "not
even" two seconds. Id. at 58.  When directly asked if it was for
"one second," plaintiff replied, "I can't give you an actual
determination of time.  It was almost immediately from the time
his finger touched my leg and started moving upwards I had his
hand and threw it off of me." Id.  In response, plaintiff
"grabbed [Mr. Finn's] hand, removed it away and told him to get
away[.]" Id., exh. G thereto.  Mr. Finn "backed off
immediately[,]" and plaintiff drove off. Id., exh. A thereto at
57; and exh. G thereto.

     The next day, February 4, 2005, "at the very first
opportunity" he had, plaintiff told Jonathan Gray, the acting
store manager, about this incident. Id. at 60; and 59.  This was
in response to Mr. Gray's casual inquiry asking plaintiff how he
was. Id. at 60.  Plaintiff told Mr. Gray that he needed to talk
to him "for a minute." Id.  The two then had "a very brief
conversation" with plaintiff quietly telling Mr. Gray what had
transpired in the parking lot with Mr. Finn. Id.  Plaintiff's
impression was that Mr. Gray "was quite shocked[.]" Id.  Mr.
Gray assured plaintiff that he would "talk" with Mr. Finn and
that he would "get it taken care of." Id.

     The second incident occurred the next time plaintiff and Mr.

- 5 -

Finn worked together -- five days later on February 8, 2005.  At

Mr. Gray's request, plaintiff wrote a "Statement of Incident"

within less than an hour after this incident occurred.[2]  <u>See</u> <u>id.</u>,

exh. H thereto.  As plaintiff recounts this incident in his

Statement, while he was "standing at [a] checkstand in the

bagging area[,]" plaintiff "felt, from behind," a "tugg[ing] on

his "left shirt sleeve . . . and a brushing against [his] tricep

area."  <u>Id.</u>; <u>see also id.</u>, exh. A thereto at 62.   This was a

"split second incident[,]" <u>id.</u>, exh. A thereto, lasting for

"[r]oughly[] . . . one or two seconds."  <u>Id.</u>, exh. A thereto at

63.  During his deposition, plaintiff speculated that perhaps "it

was kind of [Mr. Finn's] way of telling [plaintiff], hey, I am

here to bag the groceries and I will takeover [sic] for you[.]"

<u>Id.</u>, exh. A thereto at 63.  In any event, plaintiff "immediately

told [Mr. Finn] to get away from [him] and to never touch [him]

again."  <u>Id.</u> at 62.

     From there, plaintiff "went directly to the manager's

office" and had Mr. Gray paged.  <u>Id.</u>, exh. H thereto.  He also

asked a co-worker to come into the office with him to be a

witness.  <u>Id.</u>; and exh. A thereto at 64.  By his own admission,

plaintiff "unleashed a two-minute verbal tirade on [Mr. Gray]

that was nasty[,]" including the frequent use of expletives.

<u>Id.</u>, exh. A thereto at 51.  During that tirade plaintiff

described what had just happened with Mr. Finn and then "asked if

---

[2]     Immediately after writing that Statement, plaintiff wrote another "Statement of Incident[,]" pertaining to the first incident on February 3, 2005. Doc. 16, exh. G thereto.

- 6 -

1 [Mr. Finn] had been talked to about the first incident." <u>Id.</u>

2 Mr. Gray said the he had not yet talked with Mr. Finn, implying

3 that it was because "[n]either he nor [Mr. Finn] had worked

4 together" since the first incident. <u>Id.</u>, exh. H thereto. A

5 "heated" discussion ensued about "all aspects of th[e] situation

6 and [plaintiff] left the office - unsatisfied and upset." <u>Id.</u>

7   As plaintiff recalls it, "within 30 minutes after the second

8 incident occurred[,]" Bob Blaylock, a Safeway Human Resources

9 employee, came to the store and met with plaintiff for

10 "[p]robably 10, 15 minutes[.]" <u>Id.</u>, exh. A thereto at 45; and

11 66. Plaintiff was advised that an investigation would be done

12 and they would "be back in touch with" him. <u>Id.</u> at 66.

13   A few days later, on February 11, 2005, a Human Resource

14 Advisor and Mr. Blaylock  again met with plaintiff informing him

15 "that they did not find any evidence to support [his] claim[]" of

16 sexual harassment against Mr. Finn. <u>Id.</u> at 46; and 81. As part

17 of that investigation Safeway "had talked to some people at the

18 Boys and Girls club where [Mr. Finn]," plaintiff "assume[d][,]"

19 worked as a "counselor." <u>Id.</u> Safeway was advised that Mr. Finn

20 had "an exemplary record" there. <u>Id.</u>; and at 48. At that point,

21 plaintiff was further advised that Safeway was "dropping the

22 investigation[,]" and that "any punishment that [Mr. Finn] got

23 was already served[]" when he was sent home after the initial

24 interview following the second incident. <u>Id.</u> at 46-48.

25 Plaintiff also was informed that he and Mr. Finn would not be

26 scheduled to work together any more. <u>Id.</u> at 82. Plaintiff

27 indicated that he was "very dissatisfied" with Safeway's

28

1    response.  Id.  Plaintiff testified that he felt "almost as if
2    they didn't believe [his] story."  Id.

3        Following the second incident, according to Human Resources
4    Advisor Denise Diamond, a "Corrective Action Report" was taken
5    with respect to Mr. Finn.  Doc. 16, exh. I thereto at 2, ¶ 26.
6    Mr. Finn received a "verbal warning" and a three day suspension,
7    the "duration of [the] investigation[.]" Id., exh. J thereto
8    ("Corrective Action Report").  Under the section of that Report
9    entitled "corrective action required[,]" it states that Mr. Finn
10   "will refrain from touching any employee or customer in an
11   unproffessional [sic] manner."  Id. As of January 26, 2007, Mr.
12   Finn was still employed with Safeway and no alleged harassment
13   complaints have been lodged against him since the February, 2005
14   incidents which are the subject of this lawsuit.  Id., exh. I
15   thereto at 3, ¶ 11.

16       Plaintiff no longer is employed by Safeway, however.  He was
17   terminated in October, 2005 after "admitt[ing] to stealing
18   approximately $4,4000 in cash during the course of his
19   employment."  Id., exh. N thereto ("Employee Investigation"
20   report); and exh. I thereto at 2-3, ¶ 9.  Plaintiff executed a
21   promissory note agreeing to repay Safeway $4,400.00 for that
22   stolen cash.  Id., exh. I thereto at 3, ¶ 10; and exh. N thereto
23   (copy of promissory note).

24       On August 31, 2005, plaintiff filed a "Charge of
25   Discrimination" with the Equal Employment Opportunity Commission
26   ("EEOC").  Doc. 1, exh. C thereto.  In that Charge, he claimed to
27   have been "sexually harassed by a co-worker, Roger Finn."  Id.

28                                  - 8 -

1    Plaintiff further alleged that he had been discriminated against

2    "because of [his] sex, male, and in retaliation for protesting

3    practices made unlawful by Title VII[.]" Id.  That alleged

4    retaliation was in the form of his supposedly being "demoted from

5    Full-time to Part-time status."  Id.

6         On January 31, 2006, the EEOC issued a "Dismissal and Notice

7    of Rights[.]" Id., exh. D thereto.  The EEOC informed plaintiff

8    that "[b]ased upon its investigation," it was "unable to conclude

9    that the information obtained establishe[d] violations of any

10   statutes."  Id.  Following the receipt of that Notice, on May 1,

11   2006, plaintiff timely filed this action in Superior Court of

12   Arizona, Maricopa County.  Id., exh. A thereto.  Safeway

13   subsequently properly removed the case to this district court.

14                          ***Discussion***

15   ***I.   Non-compliance with LRCiv 7.2***

16        At the outset the court is compelled to comment upon

17   plaintiff's response or, more accurately, his lack of response to

18   the present motion.  Significantly plaintiff did not file a

19   responsive memorandum in accordance with LRCiv 7.2©, and the time

20   to file and serve such a response has passed.  See LRCiv 7.2©;

21   and App. A ("Time Chart").  Nor did plaintiff file a statement of

22   facts as LRCiv 56.1(b) requires.  Instead, he filed a document

23   entitled "Plaintiff's Answer to Defendants [sic] Motion for

24   Summary Judgment[,]" specifically "request[ing] oral

25   argument[.]"[3] Doc. 18 at 1.

26   _____

27        [3]     Finding this case suitable for disposition without oral argument,
     the court denies this request.

28                              - 9 -

1    Local Rule of Civil Procedure 7.2(I), provides in relevant

2    part that "if the unrepresented party . . . does not serve and

3    file the required answering memoranda, . . . , such non-

4    compliance may be deemed a consent to the . . . granting of the

5    motion and the court may dispose of the motion *summarily*."   LRCIv

6    7.2(I) (emphasis added).   Invoking that Rule, defendant filed a

7    motion "request[ing] that the Court exercise its discretion"

8    thereunder and grant its motion.   Def. Mot. (doc. 19) at 2.   The

9    court declines to summarily grant defendant's summary judgment

10   motion based upon plaintiff's non-compliance with Local Rule

11   7.2(I).   See Henry v. Gill Indus., 983 F.2d 943, 950 (9th Cir.

12   1993) ("The language of the [predecessor to LRCiv 7.2(I)] is

13   permissive, conferring discretion upon the district judge to

14   determine whether non-compliance should be deemed consent to a

15   given motion.").

16   Summarily granting defendant summary judgment would amount

17   to an abuse of discretion given the Ninth Circuit's well-settled

18   view "that a nonmoving party's failure to comply with local rules

19   does not excuse the moving party's affirmative duty under Rule 56

20   to demonstrate its entitlement to judgment as a matter of law."

21   See Martinez v. Stanford, 323 F.3d 1178, 1182 (9th Cir. 2003)

22   (citing Fed. R. Civ. P. 56); see also Henry, 983 F.2d at 949-50;

23   and Hamilton v. Keystone Tankship Corp., 539 F.2d 684, 686 n. 1

24   (9th Cir. 1976).   Failing to ensure that the moving party has met

25   its burden on a summary judgment motion "turn[s] the summary

26   judgment rule into a mere sanction for noncompliance with local

27   rules[]" – a result the Ninth Circuit does not condone.   See id.

28                                   - 10 -

1   Thus, despite the Local Rule that permits summarily granting

2   motions for non-compliance, heeding the mandate of <u>Martinez</u>, this

3   court will analyze defendant's motion for summary judgment on the

4   merits.  At the same time though, as discussed below, the court

5   is unwilling to completely overlook plaintiff's non-compliance

6   with the Federal and Local Rules of Civil Procedure.

7        ***II.  Summary Judgment Standard***

8        Pursuant to Fed. R. Civ. P. 56©, a party is entitled to

9   summary judgment "if the pleadings, depositions, answers to

10  interrogatories, and admissions on file, together with the

11  affidavits, if any, show that there is no genuine issue as to any

12  material fact and that the moving party is entitled to a judgment

13  as a matter of law."  It is beyond dispute that "[t]he moving

14  party bears the initial burden to demonstrate the absence of any

15  genuine issue of material fact."  <u>Horphaq Research Ltd. v.</u>

16  <u>Garcia</u>, 475 F.3d 1029, 1035 (9th Cir. 2007) (citation omitted).

17  "The criteria of 'genuineness' and 'materiality' are distinct

18  requirements."  <u>Nidds v. Schindler Elevator Corp.</u>, 113 F.3d 912,

19  916 (9th Cir. 1996) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477

20  U.S. 242, 248 (1986)).  "The requirement that an issue be

21  'genuine' relates to the quantum of evidence the plaintiff must

22  produce to defeat the defendant's motion for summary judgment."

23  <u>Id.</u> "There must be sufficient evidence 'that a reasonable jury

24  could return a verdict for the nonmoving party.'"  <u>Id.</u> (quoting

25  <u>Anderson</u>, 477 U.S. at 248).  "As to materiality, the substantive

26  law will identify which facts are material."  <u>Anderson</u>, 477 U.S.

27  at 248.

28                              - 11 -

1    "Once the moving party meets its initial burden, . . . , the
2    burden shifts to the nonmoving party to set forth, by affidavit
3    or as otherwise provided in Rule 56, specific facts showing that
4    there is a genuine issue for trial." Id. (internal quotation
5    marks and citations omitted). This "[e]vidence must be concrete
6    and cannot rely on 'mere speculation, conjecture, or fantasy.'"
7    Bates v. Clark County, 2006 WL 3308214, at * 2 (D.Nev. Nov. 13,
8    2006) (quoting O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d
9    1464, 1467 (9th Cir. 1986)). Similarly, "a mere 'scintilla' of
10   evidence" is not  sufficient "to defeat a properly supported
11   motion for summary judgment; instead, the nonmoving party must
12   introduce some 'significant probative evidence tending to support
13   the complaint.'"  Fazio v. City & County of San Francisco, 125
14   F.3d 1328, 1331 (9th Cir. 1997) (quoting Anderson, 477 U.S. at
15   249, 252). Thus, in opposing a summary judgment motion it is not
16   enough to "simply show that there is some metaphysical doubt as
17   to the material facts."  Matsushita Elec. Indus. Co., Ltd. V.
18   Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted).
19   Nor is it sufficient for the nonmoving party to merely rely on
20   the pleadings.  Celotex Corp. v. Catrett, 477 U.S. 317, 324
21   (1986).

22       By the same token though, when assessing the record to
23   determine whether there is a "genuine issue for trial," the court
24   must "view the evidence in the light most favorable to the
25   nonmoving party, drawing all reasonable inference in his favor."
26   Horphaq, 475 F.3d at 1035 (citation omitted).  The court may not
27   make credibility determinations; nor may it weigh conflicting

28                                    - 12 -

1  evidence.  See Anderson, 477 U.S. at 255.  Thus, as framed by the

2  Supreme Court, the ultimate question on a summary judgment motion

3  is whether the evidence "presents a sufficient disagreement to

4  require submission to a jury or whether it is so one-sided that

5  one party must prevail as a matter of law."  Id. at 251-52.

6      The fact that a plaintiff is appearing *pro se*, such as Mr.

7  Proctor, does not alter the applicability of these general

8  summary judgment rules.  See Semper v. JBC Legal Group, 2005 WL

9  2172377, at *1 (W.D.Wash. 2005) ("Although the rule requires that

10  the allegations of a pro se complaint be liberally construed in

11  determining whether a viable claim has been asserted and that

12  strict compliance with procedural/technical rules will not be

13  expected of pro se litigants, it does not alter the summary

14  judgment standard or otherwise give pro se non-prisoner litigants

15  multiple opportunities to present their evidence.")  The summary

16  judgment rules apply with equal force to *pro se* litigants because

17  they "must follow the same rules of procedure that govern other

18  litigants."  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987);

19  see also Ghazali v. Moran, 46 F.3d 52, 54 (9th Cir. 1995)

20  (citation omitted) ("Although we construe pleadings liberally in

21  their favor, pro se litigants are bound by the rules of

22  procedure.") In fact, in Jacobsen v. Filler, 790 F.2d 1362 (9th

23  Cir. 1986), the Court rejected the argument that *pro se* non-

24  prisoner litigants are entitled to notice from the court

25  regarding the requirements of Rule 56.  In so doing, the Court

26  unequivocally stated that "pro se litigants in the ordinary civil

27  case should not be treated more favorably than parties with

28                              - 13 -

attorneys of record." _Id._ at 1364.  Accordingly, although Mr.

Proctor is appearing _pro se_, the court will hold him to the same

standards as it would any other non-moving party on a motion for

summary judgment.

## _II.  Title VII_

Plaintiff is alleging two separate violations of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, _et seq._

("Title VII").  First, he is alleging that he was sexually

harassed during the course of his employment at Safeway.   Doc.

1, exhs. A (Co.) and C (EEOC Charge) thereto.  Second, he alleges

that Safeway retaliated against him for complaining of that

sexual harassment.  Allegedly that retaliation took the form of

"demot[ing] [plaintiff] from full time to part time status[.]"

_Id._, exh. A thereto at 1; <u>see also</u> exh. C thereto.  The court

will address each of these claims in turn.

### _A.  Hostile Work Environment_

"Title VII . . . forbids an employer 'to fail or refuse to

hire  or to discharge any individual, or otherwise to

discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment,

_because of such individual's . . . sex._'"  <u>Craig v. M & O</u>

<u>Agencies, Inc.</u>, 2007 WL 2264635, at *8 (9th Cir. Aug. 9, 2007)

(quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis added).  "Title

VII's prohibition 'is not limited to 'economic' or 'tangible'

discrimination[.]'"  <u>Id.</u> (quoting  <u>Meritor Sav. Bank, FSB v.</u>

<u>Vinson</u>, 477 U.S. 57, 67 (1987)).  Thus, "[w]hen the workplace is

permeated with discriminatory intimidation, ridicule, and insult,

1    . . . that is sufficiently severe or pervasive to alter the

2    conditions of the victim's employment and create an abusive

3    working environment, . . ." the Supreme Court has held that

4    "Title VII is violated."  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S.

5    17, 21 (1993) (internal quotation marks and citation omitted).

6    "To make a prima facie case of a hostile work environment, a

7    person must show that: (1) []he was subjected to verbal or

8    physical conduct of a sexual nature, (2) this conduct was

9    unwelcome, and (3) the conduct was sufficiently severe or

10   pervasive to alter the conditions of the victim's employment and

11   create an abusive working environment."  <u>Craig</u>, 2007 WL 2264635,

12   at *5 (internal quotation marks and citation omitted).  Based

13   upon the plain language of Title VII, "[t]he plaintiff also must

14   prove that 'any harassment took place because of sex.'"

15   <u>Dominguez-Curry v. Nevada Transp. Dept.</u>, 424 F.3d 1027, 1034 (9th

16   Cir. 2005) (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>,

17   523 U.S. 75, 79 (1998)) (other citation omitted).

18        Safeway contends that there are two obstacles to plaintiff's

19   hostile work environment claim.  The first is plaintiff's

20   inability to show that the alleged sexual harassment was based

21   upon his gender, *i.e.* that it was "because of sex."  In

22   particular, Safeway argues that "there was no indication

23   whatsoever that Mr. Finn touched Plaintiff because of Plaintiff's

24   gender."  Mot. (doc. 15) at 8.   Second, Safeway asserts that

25   "[p]laintiff's evidence does not come close to satisfy[ing] the

26   demanding standards for severity and pervasiveness" necessary to

27   support a hostile work environment claim.   <u>Id.</u> at 9.  Given the

28

1  plaintiff's lack of a response to this motion, the court will

2  limit its analysis to these two relatively narrow bases for

3  summary judgment.  When it does that, the court is easily

4  convinced that Safeway is entitled to summary judgment as to

5  plaintiff's Title VII hostile work environment claim.

6       *1.  "Because of Sex"*

7      "Sex discrimination consisting of same-sex sexual harassment

8  is actionable under Title VII[.]"  <u>Onacle</u>, 523 U.S. at 82.  Thus,

9  the fact that plaintiff and his alleged harasser, Mr. Finn, are

10 both male, does not render Title VII inapplicable here.

11 Nonetheless, plaintiff cannot survive Safeway's motion for

12 summary judgment on his hostile work environment claim because,

13 as discussed below, he has not met his burden with respect to the

14 "because of sex" element of such a claim.

15     As noted at the outset, a plaintiff alleging a hostile work

16 environment must prove that "any harassment took place because of

17 sex."  <u>Dominguez-Curry</u>, 424 F.3d at 1034.  That does not mean,

18 however, that a plaintiff must prove that the harassing conduct

19 was "motivated by sexual desire to support an inference of

20 discrimination on the basis of sex."  <u>Oncale</u>, 523 U.S. at 80.

21 Rather, the Supreme Court in <u>Onacle</u> outlined three "evidentiary

22 route[s]" whereby a Title VII plaintiff can show an inference of

23 discrimination because of sex.  The first, where such an

24 inference is "easy to draw," is in a male-female sexual

25 harassment situation where "the  challenged conduct . . .

26 involves explicit or implicit proposals of sexual activity[.]"

27 <u>Id.</u> at 80.  This "same chain of inference [is] available to a

28                               - 16 -

1  plaintiff alleging same-sex harassment, if there were credible
2  evidence that the harasser was homosexual."  Id.  Another way in
3  which a plaintiff who is claiming same-sex harassment may show an
4  inference of discrimination is if he was "harassed in such sex-
5  specific and derogatory terms by another []man as to make it
6  clear that the harasser [wa]s motivated by general hostility to
7  the presence of []men in the workplace."  Id.  "A same-sex
8  harassment plaintiff may also, . . . ., offer direct com-parative
9  [sic] evidence about how the alleged harasser treated members of
10 both sexes in a mixed-sex workplace."  Id. at 80-81.  The Supreme
11 Court was emphatic in Oncale though, "[w]hatever evidentiary
12 route the plaintiff chooses to follow, he . . . must always prove
13 that the conduct at issue was not merely tinged with offensive
14 sexual connotations, but actually constituted 'discrimina[tion]
15 . . . because of . . . sex.'"  Id. at 80 (emphasis added by Oncale
16 Court).

17      Viewing the record in the light most favorable to plaintiff,
18 as it must, the court cannot find that either of the incidents of
19 which he is complaining "actually constituted discrimination
20 because of sex."  See id.  The record does not support an
21 inference of same-sex discrimination under any of the evidentiary
22 theories enumerated in Oncale.  There is no evidence that the
23 challenged conduct "involve[d] explicit or implicit  proposals of
24 sexual activity[.]"  See id.  Nor is there any evidence that Mr.
25 Finn was homosexual.  Likewise, the manner in which plaintiff was
26 allegedly harassed, the momentarily placement of a finger on his
27 thigh and brushing against his tricep area for a "split-second,"

28
                              - 17 -

1  was not "in such sex-specific and  derogatory terms as to make it

2  clear that [Mr. Finn] [wa]s motivated by general hostility to

3  []men in the workplace."  See id.  Finally, there is not any

4  "direct comparative evidence" in the record as to how Mr. Finn

5  treated members of both sexes in [that] mixed-sex workplace."

6  See id. at 80-81.

7       Moreover, Mr. Finn's "put[ting] his finger on [plaintiff's]

8  inner thigh and . . . rubbing up towards [plaintiff's]

9  privates[,]"  perhaps "a quarter inch[,]" doc. 16, exh. A thereto

10  at 56 and 57, was at most conduct "merely tinged with offensive

11  sexual connotations[.]" See Oncale, 523 U.S. at 81.  As the

12  Supreme Court made clear in Oncale, however, conduct of that type

13  does not support an inference of discrimination "because of sex."

14   The second incident, where Mr. Finn allegedly tugged on

15  plaintiff's shirt sleeve and brushed against plaintiff's tricep

16  area was again, at the very most, conduct "merely tinged with

17  offensive sexual connotations[.]" See id.  As the foregoing

18  shows, there is a complete lack of any probative evidence, let

19  alone "*significant* probative evidence[,] tending to support" an

20  inference of discrimination because of gender here.  See

21  Anderson, 477 U.S. at 252 (emphasis added).  Thus, because

22  plaintiff has not made a "showing sufficient to establish the

23  existence of an essential element" of his hostile work

24  environment claim, an element "on which he will bear the burden

25  of proof at trial[,]" summary judgment is proper.  See  Celotex,

26  477 U.S. at 322.

27  . . .

28

1

## 2.  *"Severe or Pervasive" Conduct*

2        Assuming for the sake of argument that plaintiff had raised

3   a genuine issue of material fact as to whether Mr. Finn's actions

4   constituted discrimination "because of sex" (which he did not),

5   still, Safeway would be entitled to summary judgment as to this

6   hostile work environment claim.  Summary judgment is proper

7   because plaintiff likewise has not met his burden of showing a

8   genuine issue of material fact as to the third element of such a

9   claim.

10       To satisfy the third element of a hostile work environment

11  claim, a plaintiff "must show that h[is] work environment was

12  both subjectively and objectively hostile."  <u>Galdamez v. Potter</u>,

13  415 F.3d 1015, 1023 (9th Cir. 1995); <u>see</u> <u>also</u> <u>Harris</u>, 510 U.S. at

14  20-21.  "Objective hostility is determined by examining the

15  totality of the circumstances and whether a reasonable person

16  with the same characteristics as the victim would perceive the

17  workplace as hostile."  <u>Craig</u>, 2007 WL 2264635, at *8 (citing

18  <u>Harris</u>, 510 U.S. at 20-21).  The totality of the circumstances

19  inquiry "includ[es] the frequency, severity, and nature (*i.e.*,

20  physically threatening or humiliating as opposed to merely

21  verbally offensive) of the conduct."  <u>Galdamez</u>, 415 F.3d at 1023

22  (citation omitted).  "The required severity of the conduct varies

23  inversely with its pervasiveness and frequency."  <u>Id.</u>

24  Significantly, "[t]he Supreme Court has cautioned that 'simple

25  teasing, offhand comments, and isolated incidents (unless

26  extremely serious) will not amount to discriminatory changes in

27  the terms and conditions of employment.'"  <u>Craig</u>, 2007 WL 2264635,

28

1  at *5 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788

2  (1998)).  In other words, "[c]onduct that is not severe or

3  pervasive enough to create an objectively hostile or abusive work

4  environment -- an environment that a reasonable person would find

5  hostile or abusive -- is beyond Title VII's purview."  <u>Oncale</u>,

6  523 U.S. at 81 (citing <u>Harris</u>, 510 U.S. at 21).

7       Considering the evidence in the light most favorable to

8  plaintiff, clearly he has not raised a genuine issue of material

9  fact as to whether the two incidents with Mr. Finn were so severe

10  or pervasive as to "create an objectively hostile or abusive work

11  environment[.]" <u>See</u> <u>id.</u>  The two incidents were of extremely

12  short duration, and obviously infrequent.  The first, as

13  plaintiff readily conceded, lasted "not even" two seconds.  Doc.

14  16, exh. A thereto at 58.  And the second incident plaintiff

15  himself described as a "split-second incident."  <u>Id.</u> at 63.

16  Further, even plaintiff realized that the second, sleeve tugging

17  incident, may simply have been Mr. Finn's way (as a

18  developmentally disabled person), of letting plaintiff know that

19  Mr. Finn was available to assist with bagging groceries.  <u>Id.</u>

20       Employing the totality of the circumstances test adopted by

21  the Supreme Court in <u>Harris</u>, this case falls into the category

22  where "it is clear from the facts that the offensive behavior

23  alleged is legally insufficient to rise to the level of sexual

24  harassment."  <u>See</u> <u>Cleese v. Hewlett-Packard Co.</u>, 911 F.Supp.

25  1312, 1320 (D. Or. 1995) (citing <u>Candelore v. Clark County,</u>

26  <u>Sanitation Dist.</u> 975 F.2d 588, 590 (9th Cir. 1992) (*per curiam*)

27  (internal quotation marks and citation omitted) ("isolated

28

1    incidents of sexual horseplay alleged by [plaintiff] took place

2    over a period of years and were not so egregious as to render

3    [her] work environment hostile[]")).   In fact, the conduct

4    alleged herein is far less egregious than other reported cases

5    where courts likewise have found that the alleged harassment was

6    not severe enough to support a hostile work environment claim.

7    See, e.g., Brooks v. City of San Mateo, 229 F.3d 917, 926 (9th

8    Cir. 2000) (single incident where co-worker touched plaintiff's

9    stomach and breast under her sweater, although "highly

10   offensive[,]" did not rise to the level of a hostile work

11   environment) (and cases cited therein).   Simply put, this record

12   does not raise a genuine issue of material fact as to the

13   "crucial" requirement of a hostile work environment claim –

14   conduct so severe or pervasive as to "create . . . an environment

15   that a reasonable person would find hostile or abusive[.]" See

16   Oncale, 523 U.S. at 1003 (internal quotation marks and citations

17   omitted).   Hence, the fact that Mr. Finn's conduct was not

18   sufficiently severe or pervasive so as to alter the conditions of

19   plaintiff's employment and create an abusive work environment,

20   provides another basis for granting Safeway's motion for summary

21   judgment on this particular Title VII claim.[4]

22       ***B.  Retaliation***

23       Title VII makes it unlawful, among other things, "for an

24   employer to discriminate against any of his employees . . .

25   _____

26        [4]    Because the court has found that the alleged harassment was not
     sufficiently "severe and pervasive[,]" it need not address the issue of whether
27   Safeway failed to take adequate remedial measures.   See Millwood v. Torrez, 1999
     WL 144876, at *5, n. 2 (N.D.Cal. 1999).

28                                    - 21 -

1  because he has opposed any practice made an unlawful employment

2  practice by [Title VII], or because he has made a charge,

3  testified, assisted, or participated in any manner in an

4  investigation, proceeding, or hearing under this subchapter."  42

5  U.S.C. § 2000e-3(a).  "In order to establish a prima facie case

6  of retaliation under Title VII, [a plaintiff] must demonstrate

7  that (1) []he engaged in an activity protected under Title VII;

8  (2) h[is] employer subjected h[im] to adverse employment action;

9  and (3) a causal link exists between the protected activity and

10 the adverse employment action."  Thomas v. City of Beaverton, 379

11 F.3d 802, 811 (9th Cir. 2004) (citation omitted). If possible,

12 plaintiff's retaliation claim is even more attenuated than his

13 hostile work environment claim.

14     Even if plaintiff Proctor engaged in a protected activity (a

15 highly doubtful proposition[5]), he cannot survive Safeway's

16 summary judgment motion on this retaliation claim because he was

17 not  subjected to an "adverse employment action" for reporting

18 Mr. Finn.  In his complaint plaintiff alleges that Safeway "did

19 nothing to satisfy [his] harassment and after [his] warnings of

20 legal action, . . . demote[d] [him] from full time to parttime

21 [sic] status[.]"  Doc. 1, exh. A thereto.  The evidence belies

22 this assertion.  Because he never had full time status to begin

23 with, plaintiff could not, as he alleges, have been "demoted."

24 The uncontroverted proof shows that in accordance with the

25

26     [5]    See Clark County School Dist. v. Breeden, 532 U.S. 268, 1510 (2001)
27 (Title VII retaliation claim precluded where no reasonable person could have
   believed that a single incident of sexual harassment violated that statue).

28                                  - 22 -

1  collective bargaining agreements which governed the terms of

2  plaintiff's employment with Safeway, a part-time employee did not

3  become full-time until he "worked in his . . . 'home' store for

4  forty (40) hours per week for sixteen (16) consecutive weeks[.]"

5  Doc. 16, exh. L thereto at 7; and <u>id.</u>, exh. K thereto at 6, §

6  6(b).  Plaintiff's time records, which also are part of the

7  record herein, "show that he never worked a minimum of 40 hours

8  for 16 consecutive weeks."  <u>Id.</u>, exh. I thereto at 2, ¶ 8; and

9  exh. M thereto.  Consequently, because plaintiff never had full-

10  time status he could not have been demoted, regardless of the

11  reason.  Without proof of an adverse employment action, which is

12  essential to a *prima facie* Title VII retaliation claim, Safeway

13  is entitled to summary judgment as to this claim as well.  <u>See</u>

14  <u>Smith v. Richardson</u>, 2007 WL 270734, at *6 (D. Nev. Sept. 13,

15  2007) (granting summary judgment in employer's favor on Title VII

16  retaliation claim due to a lack of evidence that employer's

17  "decision not to proceed with a preliminary inquiry" as to

18  possible parole violations of one of employee's offenders was an

19  adverse job action).

20  ***III.  Breach of Contract***

21      In addition to his Title VII claims, plaintiff purports to

22  be asserting a "breach of employment contract" cause of action.

23  <u>See</u>  Doc. 1, exh. A thereto.  There is absolutely nothing in

24  plaintiff's complaint, however, pertaining to this alleged

25  breach.  When questioned during his deposition about this breach

26  of contract claim, plaintiff offered  his theory that "[t]he

27  employee handbook and [the] sexual-harassment [sic] policy . . .

28                          - 23 -

1   in it" is the "contract" which forms the basis for this claim.

2   Doc. 16, exh. A thereto at 144.  Plaintiff posits that Safeway

3   breached its zero tolerance policy contained therein with respect

4   to sexual harassment by not "immediately" acting upon the first

5   incident with Mr. Finn, and thus "allowing [the] second . . . to

6   occur."  <u>Id.</u>  As plaintiff made clear during his deposition, this

7   is the sole basis for his breach of contract claim.  <u>See id.</u> at

8   145-47.

9       In order to establish a breach of contract claim based upon

10  an  employee handbook, "plaintiff must establish: (1) that the

11  Handbook provisions became a part of the employment contract; and

12  (2) that the terms of the Handbook were breached."  <u>Thomas v.</u>

13  <u>Garrett Corp.</u>, 744 F.Supp. 199, 200 (D. Ariz. 1989) (citing

14  <u>Wagner v. City of Globe</u>, 722 P.2d 250, 254 (Ariz. 1986)), <u>aff'd</u>

15  <u>without pub'd opinion</u>, 904 F.2d 41 (9th Cir. 1990).  As to the

16  first element, the Arizona Supreme Court in <u>Leikvold v. Valley</u>

17  <u>View Comty. Hosp.</u>, 688 P.2d 170, 173 (Ariz. 1984), <u>superseded on</u>

18  <u>other grounds by statute</u>, A.R.S. § 23-1501, *et seq.*, "held that

19  representations in a personnel manual upon which employees

20  reasonably rely, can become terms of an employment contract and

21  can limit an employer's ability to discharge employees."  <u>Thomas</u>,

22  744 F.Supp. at 200.

23      At the same time, the <u>Leikvold</u> Court "cautioned that not all

24  personnel manuals became part of the employment contract."

25  <u>Duncan v. St. Joseph's Hospital and Medical Center</u>, 903 P.2d

26  1107, 1113 (Ariz. Ct. App. 1995).  In qualifying the

27  circumstances under which representations in employee handbooks

28                              - 24 -

1    can become part of employment contracts, the <u>Leikvold</u> Court

2    stated:

3           We do not mean to imply that all personnel
            manuals will become part of employment
4           contracts. *Employers are certainly free*
            *to issue no personnel manual at all or to*
5           *issue a personnel manual that clearly and*
            *conspicuously tells their employee that the*
6           *manual is not part of the employment contract*
            and that their jobs are terminable at the
7           will of the employer with or without reason.

8    <u>Leikvold</u>, 688 P.2d at 174 (emphasis added).  The <u>Leikvold</u> Court

9    reasoned:

10          Such actions, either not issuing a personnel
            manual or issuing one with clear language
11          of limitation, instill no reasonable expectations
            of job security and do not give employees any
12          reason to rely on representations in the manual.

13   <u>Id.</u>

14        Conversely, if an employee handbook "contains contractual

15   statements, [it] may alter the . . . nature of an employment

16   relationship."  <u>Wilkes v. Electronic Data Systems Corp.</u>, 2006 WL

17   753161, at *3 (D. Ariz. 2006) (citation omitted).  "'A statement

18   is contractual only if it discloses a promissory intent or [is]

19   one that the employee *could reasonably conclude constituted a*

20   *commitment by the employer*.'"  <u>Id.</u> (quoting <u>Demasse v. ITT Corp.</u>,

21   984 P.2d 1138, 1143 (Ariz. 1999)) (other quotation marks and

22   citation omitted) (emphasis added by <u>Wilkes</u> court).

23        In the present case, as part of his orientation plaintiff

24   received the Handbook.  Doc. 16, exh. A thereto at 52.  The plain

25   and unambiguous language of that Handbook dispels any notion that

26   any contractual rights were created thereunder.  That Handbook

27   unequivocally and prominently states:

28                                   - 25 -

1
2
3

> [I]t is expressly understood that the
> contents of this handbook DO NOT CONSTITUTE
> ALL OR PART OF THE TERMS OF A CONTRACT
> OF EMPLOYMENT.

4   <u>Id.</u>, exh. D thereto at 2 (emphasis in original).   During his

5   deposition, plaintiff readily agreed that he "at least read

6   through" this language when he received the Handbook.   <u>Id.</u>, exh.

7   A thereto at 146.   Moreover, similar language is found in the

8   "Store Policies" acknowledgment form which plaintiff signed on

9   November 11, 2002:

10
11

> The Store Policies are not intended
> to create any contractual rights or
> obligations[.]

12   <u>Id.</u>, exh. E thereto.

13       "Although whether the provisions of the Handbook became part

14   of the contract is a question of fact,[6] where the terms of the

15   agreement are clear and unambiguous," as they are here, "the

16   construction of the contract is a question of law for the court."

17   <u>See</u> <u>Thomas</u>, 744 F.Supp. at 201 (citation omitted) (footnote

18   added). Given the clear and unambiguous disclaimer language

19   quoted above, no reasonable trier of fact could conclude that the

20   Handbook became part of the employment agreement, if any, or that

21   it altered the terms of plaintiff's employment with respect to

22   Safeway's sexual harassment policy or otherwise.   In the absence

23   of a genuine issue of material fact as to an essential element of

24

25       [6]   <u>See</u>, <u>e.g.</u>, <u>Wagner</u>, 722 P.2d at 254; <u>Leikvold</u>, 688 P.2d at 173; and

26   <u>Jeski v. American Express Co.</u>, 708 P.2d 110 (Ariz. Ct. App. 1985) (factual issue
as to whether employee manual modified parties' at-will relationship where it

27   provided for termination "at any time[,]" but also pledged to provide employees
with "job security[]").

28

1   his breach of contract claim, *i.e.* that the Handbook provisions

2   became part of an employment agreement, Safeway also is entitled

3   to summary judgment as to this claim.[7]  See Almada v. Allstate

4   Ins. Co., 285 F.3d 798, 800 (9th Cir. 2002) (affirming summary

5   judgment in employer's favor on breach of employment agreement

6   claim where employee manual contained, *inter alia*, "a prominent

7   disclaimer that [it] was 'not a statement of contractual

8   rights'[]" because "no reasonable trier of fact could conclude

9   that the [employee] manual modified the provisions" of

10  plaintiff's contract).

11  ### ***Conclusion***

12       To summarize, as the foregoing analysis demonstrates, the

13  record as presently constituted is "so one-sided that one party

14  must prevail as a matter of law[;]" and that one party is

15  defendant Safeway.  See Anderson, 477 U.S. at 251-52.

16       In light of the foregoing, IT IS ORDERED that the motion for

17  summary judgment by defendant Safeway, Inc. (doc. 15) is GRANTED.

18  The Clerk of the Court is directed to enter judgment for the

19  . . .

20

21

22

23

---

24       [7]     Under Leikvold, "in addition to the language" of an employee handbook, "other conduct and representations of the employer are to be considered in determining whether the Handbook became part of the [employment] agreement." Thomas, 744 F.Supp. at 202.  Plaintiff Proctor has not, however, come forth with any proof even suggesting that Safeway engaged in conduct or made representations which might form the basis for a finding that the Handbook was part of his employment contract, if any.  As he testified during his deposition, the Handbook itself and the sexual harassment policy contained therein are the sole basis for his breach of contract claim.

25

26

27

28

1   defendant, Safeway, Inc., and terminate this action.

2        DATED this 28th day of September, 2007.

3

4

5                                                 

6                  Robert C. Broomfield
               Senior United States District Judge

7

8

9   Copies to plaintiff, pro se, and counsel of record

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28